**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
Madeline Feliciano, guardian of Nicholas Feliciano,

                               Plaintiff,

            -against-

The City of New York; New York City Health and
Hospitals Corporation ("HHC"); NYS Parole Officer
Tasha Lambre; John Doe 1 (intake officer); John Doe 2
(intake officer HHC); Jane Doe 1 (placement or
classification officer); HHC Jane Roe; Richard Roe 1
(transfer officer); Mark Peralta; Captain Terry Henry;
New York City Corrections Officer ("C.O.") Daniel
Fullerton; C.O. Kenneth  Hood; C.O. Konstantinos
Makridis; C.O. Mark Wilson; C.O. Nicholas Prensa;
EMS John Doe; EMS Jane Doe; and C.O.s John and Jane
Does 1 – 8; in their individual capacities,

                            Defendants.
-----------------------------------------------------------------X

**COMPLAINT AND DEMAND**
**FOR A JURY TRIAL**


Index No.: 20-cv-10033

     Plaintiff Madeline Feliciano ("Ms. Feliciano"), as guardian of Nicholas Feliciano, by and

through her attorneys, Beldock Levine & Hoffman LLP, alleges as follows:

## PRELIMINARY STATEMENT

1.     This civil rights action seeks redress under 42 U.S.C. § 1983 for injuries to the Plaintiff's

grandson, Nicholas Feliciano, through the defendants' unconstitutional and unlawful conduct.

2.     Plaintiff brings this action against the defendants, whose conduct caused substantial

injuries and permanent brain damage to Plaintiff's grandson while he was being detained at

facilities of the City of New York Department of Correction ("DOC") on Rikers Island. Nicholas

Feliciano's injuries were caused by a pattern and practice within the DOC, resulting in violations

of the constitutional rights of those in DOC custody, and by the deliberate and willful

indifference of DOC staff towards the medical needs of individuals in its custody.

1

3.      Plaintiff seeks an award of compensatory damages, punitive damages, and attorneys' fees.

## JURISDICTION

4.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of the constitutional and civil rights of Plaintiff's grandson.

## VENUE

5.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to Plaintiff's claims took place.

## JURY DEMAND

6.      Plaintiff demands a trial by jury in this action on each and every one of her claims for which jury trial is legally available.

## PARTIES

7.      Plaintiff Madeline Feliciano is a resident of New York State and Queens County.

8.      Plaintiff is the Guardian of her grandson, Nicholas Feliciano ("Mr. Feliciano"). Plaintiff received her Commission to Guardian on October 22, 2020.

9.      Nicholas Feliciano was, at the time of the incident herein, an 18-year-old detainee held in DOC custody at Rikers Island.

10.     Defendant the City of New York ("City") is and was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain the DOC, which acts as its agent in the area of corrections and for which it is ultimately responsible.

11.     Defendant New York City Health and Hospitals Corporation ("HHC") is a corporation organized under the laws of the State of New York. Defendant HHC provides medical and psychiatric treatment in those jails pursuant to a contract with Defendant City, and is ultimately responsible for the medical and psychiatric treatment of individuals detained in those jails. HHC assumed responsibility for the provision of medical and psychiatric treatment in Defendant City's jails in 2015. Prior to that, Defendant City provided such services through its Department of Health and Mental Hygiene which in turn contracted with various entities.

12.     NYS Parole Officer ("P.O.") Tasha Lambre ("Lambre") was at all relevant times Mr. Feliciano's parole officer.

13.     John Doe 1 (intake officer) and John Doe 2 (intake officer HHC) were the officers who were present at Mr. Feliciano's intake into the Department of Correction system.

14.     Jane Doe 1 (placement or classification officer) was the officer who determined Mr. Feliciano should be placed in general population.

15.     HHC Jane Roe is a medical professional who reviewed Mr. Feliciano's medical records and met with Mr. Feliciano while he was in custody.

16.     Richard Roe 1 (transfer officer) was the officer who determined that Mr. Feliciano should be transferred to George R. Vierno Center ("GRVC") from Robert N. Davoren Complex ("RNDC").

17.     Mark Peralta is a medical professional employed by HHC who evaluated Mr. Feliciano on November 27, 2019.

18.     Defendants Captain Terry Henry, Badge No. 740 ("Henry"); Corrections Officer ("C.O.") Daniel Fullerton, Badge No. 1670 ("Fullerton"); C.O. Kenneth Hood, Badge No. 11916 ("Hood"); C.O. Konstantinos Makridis, Badge No. 3967 ("Makridis"); C.O. Mark Wilson,

Badge No. 11452 ("Wilson"); and C.O. Nicholas Prensa, Badge No. 2953 ("Prensa"),

Emergency Medical Service John and Jane Doe ("EMS J. Does"), and C.O. John and Jane Does

1 - 8 ("C.O. Does"), hereinafter collectively referred to as ("Incident Individual Defendants"),

were at all times relevant herein, officers, employees, and agents of the City and the DOC, and

they are sued in their individual capacities.

19.     Defendants Does and Roes and C.O. Does, and EMS Does were at all times relevant

herein employees or agents of HHC and/or The City of New York and were acting under color of

state law in the course and scope of their duties and functions as agents, servants, and employees

of HHC and/or The City of New York and otherwise performed and engaged in conduct

incidental to their lawful functions in the course of their duties.  They were acting for and on

behalf of The City of New York and HHC at all times relevant herein, with the power and

authority vested in them as agents and employees of The City of New York and HHC and

incidental to their duties as agents and employees of The City of New York and HHC.  They are

sued in their individual capacities.

20.     The true and complete names, ranks, and shield numbers of Defendants C.O.s Does and

HHC Does and Roes are not currently known.  However, they were employees or agents of The

City of New York and/or HHC on the dates of the incidents.  Accordingly, they may be entitled

to representation in this action by the New York City Law Department ("Law Department")

upon their request, pursuant to New York State General Municipal Law § 50-k. The Law

Department, then, is hereby put on notice (a) that Ms. Feliciano intends to name said officers as

defendants in an amended pleading once their true and complete names, ranks, and shield

numbers become known and (b) that the Law Department should immediately begin preparing

their defense(s) in this action.

21.     The Individual Defendants' acts and omissions hereafter complained of were carried out intentionally, recklessly, or with malice, and/or a gross disregard for Mr. Feliciano.

## STATEMENT OF FACTS

22.     Mr. Feliciano had a well-documented history of past suicide attempts, self-injury, and mental illness, including a suicide attempt in January of 2019, while he was in the custody of the City of New York.

23.     In November of 2019, Mr. Feliciano was on parole.

24.     Mr. Feliciano voluntarily reported to P.O. Lambre, and she violated his parole despite not being required to.

25.     On November 19, 2019, eighteen-year-old Nicholas Feliciano was taken into custody.

26.     P.O. Lambre knew that Mr. Feliciano had significant mental health issues, including major depression, yet failed to take the necessary steps to ensure he was placed in a mental health unit.

27.     Mr. Feliciano was scheduled to appear before an administrative judge on December 20, 2019 for a determination of whether he should remain in custody, after having waived his right to a hearing within 14 days of his incarceration.

28.     On or about November 19, 2019, John Doe 1 (intake officer) and John Doe 2 (medical intake officer HHC) collectively ("Intake Does") preformed, or should have performed, an inmate intake screening, including, but not limited to, a "Suicide Prevention Screening Guidelines" checklist ("Form 330").  During Mr. Feliciano's first days in DOC custody, Intake Does completed several intake forms and evaluations pursuant to Defendant City's written policies. Those forms and evaluations were designed to assess Mr. Feliciano's psychiatric needs and suicide risk and ensure his access to needed psychiatric treatment.  These screenings utterly

1

failed to achieve their purpose of guiding decision making for individuals with suicide risks. Intake Does disregarded a known risk to Mr. Feliciano.

29.     Had Intake Does reviewed Mr. Feliciano's medical file, they would have been aware that he had attempted suicide in January of 2019 while in a City-run facility. Had they visually assessed Mr. Feliciano, they would have seen the scars on Mr. Feliciano which were the result of his cutting himself.  Had Intake Does properly evaluated Mr. Feliciano, they would have put him in a mental health unit instead of general population.

30.     Jane Doe 1 (placement or classification officer) made the decision that Mr. Feliciano should be placed at Robert N. Davoren Complex ("RNDC").  Jane Doe 1 failed to properly place Mr. Feliciano in a mental health unit.

31.     On information and belief, Richard Roe 1 (transfer officer) approved Mr. Feliciano's transfer to George R. Vierno Center ("GRVC") from RNDC.  Had Richard Roe 1 properly reviewed Mr. Feliciano's medical file prior to his transfer, they would have transferred him to a mental health unit instead of transferring Mr. Feliciano from the young adult unit at RNDC to the adult general population at GRVC.

32.     During Feliciano's time in DOC custody, HHC medical personnel Jane Roe reviewed Mr. Feliciano's medical records and met with Mr. Feliciano while he was in custody; yet, Defendant HHC Jane Roe ignored information that should have alerted her to the need to place Mr. Feliciano in a mental health unit and failed to properly place him in a mental health unit.

33.     Mr. Feliciano had been injured after a fight with inmates and was awaiting transfer to an urgent medical care center.

34.     On the evening of November 27, 2019 at approximately 6:23 p.m., Mr. Feliciano was placed in the "intake" area at Rikers Island's GRVC. GRVC is an adult general population facility and not a mental health facility.

35.     During the evening of November 27, 2019, Mark Peralta, an employee of HHC, preformed a medical assessment of Mr. Feliciano.  Mr. Peralta either failed to review information that would have been available concerning Mr. Feliciano's mental status or did review information concerning Mr. Feliciano's mental status and failed to act on that information.  Mr. Peralta should have understood Mr. Feliciano's precarious mental health state and referred him to a mental health unit.

36.     At approximately 10:11 p.m., Mr. Feliciano had not yet been transferred to receive medical treatment from injuries caused by the aforementioned altercation. Instead, he was taken from a cell with another detainee and put in a cell alone.  This cell had a surveillance camera that permits guards to observe the inmate in the cell at all times.

37.     At or about 11:15 p.m., Mr. Feliciano was visible in surveillance videos holding onto the bars of his cell, and for the next 20 minutes, Mr. Feliciano appeared shirtless climbing the benches in the cell.  Then, using the garment and a hook on the ceiling, he attempted to commit suicide by hanging himself.

38.     The hook Mr. Feliciano used to secure the noose was used in a suicide attempt approximately six days earlier.

39.     On information and belief, no work order had been submitted to remove the hook, or the work order had been submitted and a known dangerous instrumentality was left in a cell due to the long delays in DOC completing work orders.

40.     Despite viewing Mr. Feliciano on their surveillance cameras in his cell, the Incident

Individual Defendants failed to intervene to provide necessary medical assistance and instead

watched Mr. Feliciano on a closed-circuit television camera as he hung for seven minutes.

41.     At 11:41 p.m., eventually Captain Henry entered the cell and brought Mr. Feliciano down

from the makeshift noose.

42.     Over 30 minutes later, paramedics removed him from the jail complex.

43.     In reports the Incident Individual Defendants referred to Mr. Feliciano's suicide attempt

as a manipulative gesture.

44.     Mr. Feliciano was taken to the Elmhurst Hospital Prison Ward.

45.     There, he was placed on a respirator and had limited brain activity.

46.     Since then, he has limited vocal functions, cannot stand independently, nor can he feed

himself.

47.     Had Individual Defendants intervened to help Mr. Feliciano when they saw him attempt

to commit suicide by hanging himself, Mr. Feliciano would not have sustained such severe and

permanent injuries.

48.     Captain Terry Henry, C.O.s Daniel Fullerton, Kenneth Hood, Konstantinos Makridis,

Mark Wilson, and Nicholas Prensa were suspended for 30 days and are now back working for

the DOC.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983**
**(Deliberate Indifference)**

49.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing

paragraphs as if set forth herein.

1

50.     In committing the acts and omissions complained of herein, Defendants knew, were deliberately indifferent to, and/or recklessly disregarded the serious risk of harm to Mr. Feliciano.

51.     In committing the acts and omissions complained of herein, Defendants acted under color of state law to deprive Mr. Feliciano of his constitutionally protected rights under 42 U.S.C. § 1983 and the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

52.     But for defendants' willful and deliberate indifference to the medical needs of Nicholas Feliciano, he would not be in his present condition.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983
### (Monell Liability)
### *The City of New York / Health and Hospitals Corporation*

53.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if set forth herein.

54.     All of the acts and omissions of the named and unnamed individual defendants described above were carried out pursuant to overlapping policies and practices of Defendants CITY and HHC which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the CITY and HHC.

55.     Defendants CITY and the HHC, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

56.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as correctional officers  and officials pursuant to customs, policies, usages, practices, procedures and rules of Defendants CITY and HHC.

57.     The aforementioned customs, practices, procedures, and rules of Defendants CITY and HHC include, but are not limited to, the following unconstitutional practices:

        a.      Failure to provide adequate medical care, including psychiatric care, for pretrial detainees in its custody;

        b.      Failure to provide adequate medical care, including psychiatric care, for convicted prisoners who are taken into custody pursuant to a parole violation;

        c.      Failure to properly train, screen, supervise, or discipline employees, and failure to inform the Incident Individual Defendants' supervisors of their need to train, screen, supervise, or discipline the Individual Defendants for their deliberate indifference to the serious medical needs of individuals in their custody;

        d.      Failure to properly observe individuals in their cells who have a history of mental health issues, who have been isolated after being involved in an incident where force was used against them;

        e.      Failure to adequately perform intake procedures which would, inter alia, inform officers of an individual's mental health history, including the fact that the individual had previously attempted to commit suicide;

        f.      Failure to adequately review transfers between facilities and inmate placements to ensure the appropriate medical care can be delivered;

        g.      Failure to maintain a safe environment for inmates who a history of mental health issues that were known to prison officials;

1

h.      Failure to promptly respond to prevent individuals who have mental health issues from trying to kill themselves; and

i.      Failure to provide prompt medical care to individuals who have tried to kill themselves through hanging.

58.     The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein, causing injury and damage in violation of Mr. Feliciano's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

59.     Past and current litigation, department reports, and independent investigations have placed the City on notice as to the nature, causes, and persistence of deliberate indifference in the large multi-jail New York City DOC, and specifically at Rikers Island.

60.     The problems at Rikers Island specifically are of such a magnitude that the City announced it intends to shut down the whole jail complex.  In March of 2017, former Chief Judge Jonathan Lippman and then City Council Speaker Melissa Mark-Viverito stated that "Rikers Island is an affront to the civic values of New York City.  Reforming our jail system and closing Rikers Island is not simply good public policy—it is a moral imperative."[1]

61.     The New York Commission of Correction in *The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State* named Rikers Island as one of the five jails that "pose[s] an ongoing risk to the health and safety of staff and inmates and, in instances, impose cruel and inhumane treatment of inmates in violation of their Constitutional rights."  The commission found "numerous instances where a death was attributable to deficient

---

[1] *See* Jonathan Lippman and Melissa Marl-Viverito, *Closing Rikers Island Is a Moral Imperative,*
NY Times (Mar. 31, 2017), https://www.nytimes.com/2017/03/31/opinion/closing-rikers-island-is-a-moral-imperative.html.

medical care, substandard mental health services, or inadequate custody and supervision by security staff."[2]

62.     The deliberate indifference that caused Mr. Feliciano's serious injuries is not out of the ordinary at Rikers, especially for individuals with mental illnesses and other health conditions. Rather, a pattern and practice of deliberate indifference exists. Several entities, including the United States Attorney's Office for the Southern District of New York, the New York City Department of Health and Mental Hygiene, the New York City Department of Investigation, the New York Times, and the Associated Press have conducted major investigations, which have revealed patterns of abuse and neglect by DOC staff on Rikers Island.  In the past several years, there have been numerous brutal deaths due to refusal to provide medical care and supervision. For example:

      a.     Layleen Polanco died on June 7, 2019, just a few months before Mr. Feliciano was severely injured.  Ms. Polanco died from an epileptic seizure at Rikers.  She had been placed in solitary confinement, and corrections officers, who were supposed to check on her every 15 minutes, neglected to check on her for periods of up to 57 minutes. The City paid $5.9 million to settle a lawsuit regarding her death.[3]

      b.     Christian Haley died on October 23, 2014 in the custody of the DOC.  He died as a result of being transferred to a facility where his medical needs could not be met.  See,

---

[2]  Thomas Al. Beilein, Chairman of the New York State Commission on Correction, et al. *The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State*, New York State Commission on Correction, 2–3 (Feb. 2018), available at https://scoc.ny.gov/pdfdocs/Problematic-Jails-Report-2-2018.pdf
[3] *Polanco v. City of New York*, 19-cv-4623 (S.D.N.Y.) (filed November 15, 2019);
https://www.nytimes.com/2020/08/31/nyregion/layleen-polanco-settlement-rikers-transgender.html.  Seventeen corrections officers, including one captain, were disciplined for their role in the tragedy; yet only four were suspended without pay. https://www.nytimes.com/2020/06/26/nyregion/layleen-polanco-rikers-transgender-death.html?action=click&module=RelatedLinks&pgtype=Article

*Fernandez, Gertrudys et al. v. City of New York, et al.*, 17 Civ. 2431 (GHW)(SN) (SDNY).

c.     Victor Woods died on October 21, 2014 at Rikers.  He was hemorrhaging internally.  A DOC officer, while sipping from a coffee cup, watched this unfold.  Mr. Woods then bled to death.  The City settled a lawsuit regarding his death for $1.5 million.[4]

d.     Jerome Murdough, a homeless veteran, died on February 15, 2014 in a mental health unit at Rikers.  He was locked in a 101-degree cell for hours.  DOC officers ignored his pleas for help.  The City paid $2.25 million to settle the lawsuit regarding his death.[5]

e.     Bradley Ballard died on September 11, 2013 at Rikers.  DOC staff watched him deteriorate for days in an observation unit, where he was deprived of medications for diabetes and schizophrenia and had no running water.  Mr. Ballard sexually mutilated himself and was found naked and covered in urine and feces.  The City paid $5.75 million to settle the lawsuit regarding his death.[6]

f.     Carlos Mercado died on August 24, 2013 at Rikers.  Mr. Mercado experienced diabetic ketoacidosis.  DOC officers ignored frantic pleas from others for help.  When

---

[4] Jake Pearson, *Widespread Problems on Rikers Island Tough to Finally* Fix, Washington Post (Dec. 28, 2014), available at https://www.washingtonpost.com/politics/widespread-problems-on-rikers-island-tough-to-finally-fix/2014/12/28/b2a92e6c-8d2c-11e4-a085-34e9b9f09a58_story.html
[5] Justin Worland, *$2.5 Million Settlement for Hot Jail Cell Death on Rikers Island*, Time (Oct. 31, 2014), available at https://time.com/3551713/rikers-hot-jail-cell-death-settlement/.
[6] Weiser, Benjamin, *City to Pay $5.75 Million Over Death of Mentally Ill Inmate at Rikers Island*, New York Times (Sept. 27, 2016), available at https://www.nytimes.com/2016/09/28/nyregion/rikers-island-lawsuit-bradley-ballard.html.

1

Mr. Mercado fell onto the floor of a cell, officers stepped over him.  The City paid $1.5 million to settle the lawsuit regarding his death.[7]

g.      Jason Echevarria died on August 18, 2012.  Mr. Echevarria, an individual known to have a serious mental illness, ingested toxic detergent, and then died after hours of begging for medical care and not receiving it.  The DOC captain who ignored the pleas for help received a 5-year prison sentence for deprivation of rights under color of law. The City settled a lawsuit regarding his death for $3.8 million.[8]

63.     The foregoing incidences and the civil litigation arising from them have put the City and DOC on notice that the failure to monitor the individuals in their care and supervise, train, and discipline staff create a significant risk of death or serious injury.

64.     Because of the DOC's failure to properly supervise and train corrections officers,[9] a proper procedure for observing an individual after a use of force and as they are awaiting medical care had not been implemented.  As a result, under DOC pattern and practice, staff regularly placed individuals in cells for lengthy periods of time as they await medical treatment, and staff do not properly observe them in appropriate intervals, at a time when their medical needs are especially acute.  This policy resulted in Mr. Feliciano being left in a cell for hours awaiting medical attention after a use of force incident.

---

[7]  Michael Schwirtz, *City to Pay $5.3 Million to End Suits Over 2 Rikers Inmates' Deaths*, New York Times (Nov. 17, 2015), available at https://www.nytimes.com/2015/11/18/nyregion/rikers-inmate-jason-echevarria-wrongful-death-lawsuit-settlement.html.

[8]  Department of Justice, United States Attorney's Office for the Southern District of New York, *Former Rikers Island Correction Officer Sentenced to Five Years in Prison for Deliberately Ignoring Urgent Medical Needs of Inmate Who* Died, (June 18, 2015), available at https://www.justice.gov/usao-sdny/pr/former-rikers-island-correction-officer-sentenced-five-years-prison-deliberately.

[9]  There have also been reports of DOC failure to properly oversee medical staff.  The City's own Department of Investigations revealed in 2015 that the DOC  allowed 658 fingerprint cards for background checks on applicants pile up for years without processing them. Thus, medical staff were hired without verification of professional licensures.  https://www1.nyc.gov/assets/doi/downloads/pdf/2015/June15/pr16corizonrpt_61015.pdf.

65.     The DOC was recently ordered to develop a protocol to observe individuals in cells who

need medical treatment after a use of force incident, such as the incident Mr. Feliciano

experienced.  In *Nunez, et al. v. City of New York, et al.,* twelve plaintiffs pursued a class action

against the City alleging that the DOC engaged in a pattern and practice of excessive force

against inmates in its jail system. The United States joined the class action lawsuit as a plaintiff.

In August 2020, a Remedial Order was entered requiring the DOC to improve staff supervision,

properly supervise young inmates, and develop protocols that address the need to regularly

observe individuals awaiting medical treatment or confined in cells after a use of force incident,

and place limitations on how long individuals may be held in a cell after a such an incident.[10]

66.     The DOC has in general failed to implement proper procedures to ensure individuals at

Rikers receive medical attention.  To the extent certain policies are in place, the DOC has failed

to properly supervise and train officers to respond to medical needs.

67.     Most demonstrative of the failure to supervise is the fact that one of the individual

defendants—Captain Terry Henry—has been previously disciplined for similar conduct

68.     In *Carlson et al. v. City of New York et al.*, 17 Civ.172 (PAE) (S.D.N.Y.) (filed Jan. 10,

2017), Henry and other corrections officers were named as defendants in a case in which an

individual was gasping for air, experiencing chest pain, and convulsing on the floor.  *Id*. (Dkt.

No. 82 at 5).  That individual pleaded for help from corrections officers, including Henry, but his

serious medical needs were deliberately ignored, and he died.  Henry, in a hallway nearby, heard

calls for help and ignored them, just as he ignored Mr. Feliciano's serious medical needs.  Henry,

---

[10] *See Nunez, et al. v. City of New York, et al.,* 11 Civ. 5845 (LTS)(JCF) (S.D.N.Y.) (ECF 350 at 3) (Aug. 14, 2020 "Remedial Consent Order"); *see* United States Attorney's Office, Southern District of New York, *Acting Manhattan U.S. Attorney Announces Agreement To Address New York City's Ongoing Non-Compliance With Rikers Consent Judgment,* United States Department of Justice (Aug. 6, 2020), https://www.justice.gov/usao-sdny/pr/acting-manhattan-us-attorney-announces-agreement-address-new-york-city-s-ongoing-non.

a corrections officer at that time, has since been promoted to a captain, despite the DOC disciplining him for the death of a person in his care and reaching a settlement to compensate the mother of the person who tragically died after his medical needs were ignored in *Carlson*.  Henry was not adequately trained to address serious medical needs then, and the injuries Mr. Feliciano sustained show that the DOC since then has also still not adequately trained and supervised Henry and others.

69.    The City of New York does not have the ability to execute and complete routine work orders.  See generally *Benjamin v. Brann*, 75 Civ. 3073 (LAP)(S.D.N.Y.).

70.    Repeated litigation demonstrated the City's constructive acquiescence to the pattern of deliberate indifference to the physical and medical needs of people in DOC custody.  Failure to adopt policies that provide for adequate care of individuals at Rikers, such as ensuring they receive medications, are monitored after uses of force, etc., as well as the practice of deliberately not training or supervising employees to correctly to perform these duties, has resulted in the current state of frequent brutality and indifference at Rikers.

71.    As a result of the aforementioned conduct of the City, and the Individual Defendants, Nicholas Feliciano's constitutional rights were violated, resulting in his severe physical injuries and permanent brain damage.

**WHEREFORE**, Plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

    a.  Compensatory damages;

    b.  Punitive damages;

    c.  The convening of a jury to consider the merits of the claims herein;

    d.  Pre- and post-judgment costs, interest, and attorney's fees; and

1

e.   Such other further and different relief as to the Court may deem appropriate and equitable.

Dated:          November 30, 2020
               New York, New York


                              Respectfully submitted,

                              BELDOCK LEVINE & HOFFMAN, LLP
                              99 Park Avenue, PH/26th Floor
                              New York, New York 10016
                              t: 212-277-5825
                              e: jmoore@blhny.com; drankin@blhny.com


                                      /s/
               By:_____
                              Jonathan C. Moore
                              David B. Rankin
                              Regina Powers

                              *Attorneys for Madeline Feliciano*

1